My name is Fred Acheson. I'm from Reno, Nevada, and I represent the appellant. A little bit of background here in this case I think is kind of important for several reasons. Edibierto Alvarez-Farfan left Mexico, the southern portion of Mexico, down near Guatemala when he was about 35 years old. He left Mexico at the end of 2000 and migrated first to California. He was primarily a farmer. He came from a very rural jungle area in southern Mexico. He'd never been in the United States before. He had no criminal history. When he came to the United States, he eventually ended up in Winnemucca sorting potatoes. There's a large potato processing plant there. This would have been around the fall of 2001, thereabouts. The potato sorting business petered out. It's a seasonal thing. He scrounged jobs from wherever he could because he didn't have papers. He was illegal. He eventually started doing pickup work, small work, for people around the area. One of the individuals he ran into was a Solerio. I forget his last name. I think maybe it's Blanco. Solerio owned a number of properties in Winnemucca. Edibierto, the appellant herein, went to work for Solerio, fixing up his houses and stuff like that. He ran into Rene Blanco, who was the co-defendant in this case, who had a significant history in controlled substances, was being investigated by the DEA, things of that sort. Edibierto, while working for Solerio, became involved with helping Blanco as well. Now, Mr. Blanco was the target of the DEA, target of an investigation. And an investigation concerning Blanco commenced on or about September of 2001, I believe, and led to a person by the name of Rivera being employed as a snitch to assist in procuring evidence against Mr. Blanco. Mr. Alvarez, up to this point in time, was totally unknown to the DEA and, as I stated, had no criminal history. About September 21st, Rivera, Barriga, and I will call him Rivera, managed to make contact with Blanco, and a tape-recorded conversation was obtained by the DEA in that regard. Then again, and during that conversation with Blanco, there was a negotiation for a drug transaction. At this time, and it's undisputed, and on the tape, and that would be N7 that was admitted into evidence, Alvarez was heard coming in from the outside, having run a weed eater where he was working in the yard, and it was quite hot out at that time. It's hot in September in Winnemucca. And he got a drink of water and went back out. All the negotiations were between Blanco and Rivera. Mr. Alvarez, again on September 28th, was allegedly employed to deliver an amount of controlled substance for Blanco to a motel room. Now that tape in question, that would be tape N8, and tape later N9 was taken on October 16th, would be the total number of tapes that were seized in this case were recorded. We had obtained evidence having this information, we obtained evidence that suggested that tape N8 was a different frequency, a different pitch, and was in fact involved a different person other than the persons on tape N7 or tape N9, and we informed the court of that. The tapes were of very poor quality, and the tape N8 was ultimately excluded based upon the poor quality of the tape itself. Could you ask that tape N8 be admitted in order to compare the tonal quality, not in terms of what was said, but in terms of the tonal quality? Be careful of what you request in writing, because in my motion I requested three things. I requested that the tape be excluded,  and created the transcript of the tape be produced so I could use that person as a witness. The judge elected to exclude the tape, and that isn't something I really wanted, but I asked for it, and when it was done I was kind of surprised what I preferred and what I requested, because as you know in foreign language situations, it's the interpretation of the tape that's actually the evidence. And so I wanted the expert opinion of the interpreter that was employed by the government to come to court, and I wanted to offer that person's interpretation of the tape, because that is the actual evidence under Ninth Circuit law. Well, what occurred was after I made my defense known that tape N8 was a different person than N7 and N9, and DiBierto, my client, always admitted that he was on tape N7 and tape N9, and he always disputed that he delivered any drug, and he said that's not me on N8. So I was in a ñ it was a perilous position for me, because the tape on the one hand showed the transaction, or showed a transaction, so it would be technically a benefit to have no evidence of that transaction before the court. However ñ But the short answer is no, you did not ask for it. Mea culpa. The short answer is I blew it. No, you had your reasons. Okay. But what occurred was very peculiar during the course of the trial. When we started getting into Rivera's situation ñ now, Rivera was a professional informant. He did it for the money. He was able to stay in the country. He was able to make money off of his service to the DEA, and perhaps to immigration. I don't know. But he was of service to the government, to the United States government. Rivera was brought to Winnemucca to further this association with Blanco in order to cause Blanco's arrest. However, he didn't have any negotiations concerning the substance with Alvarez. What he did was he negotiated almost exclusively with Blanco, and during the negotiations actually he and Blanco decided, according to the government's position, that Alvarez would be the one that would deliver the substance. Now, if you can imagine two carloads of DEA agents coming from Reno, Nevada, with photographic equipment, an arranged meeting at a certain place, agents in various areas of Winnemucca to surveil the economy and room when the deal was supposed to go down, and not one photograph or not one independent corroborative speck of evidence concerning Alvarez was ever produced. Well, at first they were set up at a different motel. Now, the allegation is that Blanco called up Rivera and wanted to change the location. There was no recording of that call. There was nothing to prove that that call ever even existed, really. What occurred was Rivera said he wants to change it, change the location of the economy inn, and they went over to the economy inn at room 111 about an hour before the deal went down. Can I ask you this? Isn't your point that the only evidence whatsoever that placed Alvarez at the economy inn at the time of the deal was Rivera? True. All right. And you wanted to put in the motel room receipt that was signed by Rivera, correct? I'm getting to that. But your time is almost up, so it probably is up. But you wanted to put that receipt in, is that correct? I was told I had 20 minutes per side. All right. Well, then I'm wrong about it. But here's what I want to get at. Here's my question, then you get to it, is explain to us how, if you had been able to get that receipt in the evidence, it would have changed the outcome of the trial or at least improved the strength of your argument. Good point. Well, we know we have motive on the part of Rivera. He wants to make money. We know we have opportunity on the part of Rivera because he was not searched prior to going to the economy inn. His car was not searched, and his girlfriend was never monitored. So we know we have motive and opportunity. I need a little bit of proof. So I have authenticated by an agent, Agent Rossi, the handwritten in printed form, actual and in Rivera's hand, his handwritten statement to the agent. It's in evidence. It's certainly not in evidence, but it's properly authenticated, and I want it into evidence for comparison purposes. We know it's his. It's properly authenticated for use to compare handwriting, and we know it's Rivera's. Then we have the actual motel room receipt, not just a copy, and the copies were very bad. We have the actual motel room registration receipt that was seized by the DEA agents, and it was testified to by Agent Rossi that it was seized from that motel for that room on that date related to this case. So if we know absolutely Rivera's handwriting, and we know that we have this receipt that we want to compare it to to try to determine the author on the motel room receipt, then we don't have an authentication problem. And under Woodson and under 28 U.S.C. 1731, I am entitled to put this stuff on an overhead projector after it's admitted and to say this is Rivera's. We have his testimony saying it is, and this is the motel room receipt. The handwriting is sufficiently similar. I understand. Did Rivera deny at trial that he had reserved the room? Yes. He denied that? Yes. So you could have impeached him with this evidence? Yes, and it's direct evidence indicating that he did, in fact, do so. Who did Rivera say reserved the room? He says Alvarez did or somebody else. All right. Now show us in this record, let's just let us look at a comparison of the handwriting to see how close they are. Where in the record can we find these? You'll find it in the excerpt of record, I believe, 118. That's the economy in. That's the economy in. 119 through 121 is Rivera's handwritten statement in the DEA. All right. Now the name on 118, the economy in, it looks like Rodriguez. What's the first name there? I'm not sure what the first name is, but the last name is Rodriguez, and that brings up the third document that I wanted to introduce, and that's the Altel records where Mr. Rivera, months before when he obtained his cell phone, used the fake name Rodriguez, the same fake name that was used on the motel registration card. Was that put in the evidence? The judge wouldn't allow me to put it in there. Well, first, was the economy in slip put in the evidence? No. For illustrative purposes, I tried to get it in. The judge wouldn't let me because he would not let me make a comparison. All right. So then you weren't allowed to put in either page 118 or the statement to the agent that was signed. Correct. And what was the other thing you weren't allowed to put in? Well, the Altel record, and that would be 124, the records, and this is almost impossible to read, but if you look at document 124, the name on the Altel cell phone records was Rodriguez. It's right in the middle of this terrible copy. How do we know that that record had anything to do with Rivera? Rivera's cell phone. It was Rivera's cell phone records that I obtained from Altel during the middle of the trial. I obtained these records on the last day of trial. In fact, maybe evidence had concluded. I can't recall. Well, if that's true, then you didn't give this to the judge in time. How is a judge supposed to know you were going to get this in the future? I made a motion, a written motion, after he denied the proffer. I made a written motion that I made to the judge prior to the conclusion of the case indicating I wanted to get Rivera back on the stand. Before the conclusion of the evidence or before the conclusion of the verdict? I think it was before the conclusion of the evidence. I think I was trying to get the judge to rethink his ruling in regard to Woodson. I told him about Woodson, and I told him about my entitlement to have a jury compare the handwriting. But at the time the judge made the original decision, he didn't know anything about the Altel record. I believe, no, not at that time, but immediately afterwards and during the course of the trial, I didn't know about it. Well, but whose job is it to get that? It's not the judge's job to go out and get these records. I mean, you should have subpoenaed it and said Rodriguez equals Rodriguez. I made a motion for discovery. I was severely limited as to what the government objected to everything. I was limited as to what I could ask him before trial. When I got into trial, all of this, I made these requests during the course of trial as I found out about the cell phones, about his cell phone and other information. I wanted to get his records. I did get his records, and it's very hard to do so unless you work through the government, because I don't know who the man is. All right. I have one last question. Let's look at the evidence that you did lay before the judge. You have the economy in slip, and then you have the next few pages that are a statement. And explain to us how somebody looking at these two documents would draw the conclusion that the same person wrote both. They're both printed. Some of the letters that I listed down there, and I set it forth in my brief, especially the R, especially the G. The way they are reflected there indicates to me that they're the same person. All right. Show me the G and the R again. I see it on 118. Show me the corresponding ones on the other statement that you think are written in the same manner. Well, suffice it to say, I think the jury is entitled to look at this stuff, that the judge is not entitled to pass upon that issue. Well, that's a different point. Now, maybe that's right, except if these documents don't look like anything close, maybe it's harmless error. On the other hand, if they are close, maybe it was not harmless. So you say the R and the G look the same, but I'm not seeing that myself. Well, I had, you know, when I was putting this, attempting to put this evidence on, I had an overhead projector and I had things laid out in an acetate, and I had about eight or nine letters that I also pointed out in a written motion that I felt were sufficiently similar to lead a jury to draw the conclusion that what Mr. Alvarez was saying was correct. I wasn't allowed to do any of it. And this is in this. The coincidences concerning Rivera are pretty important. When you look at the fact that he wasn't controlled in the normal fashion, when you look at the fact that the change in rules wasn't done, the change in location of the motel was not done under a controlled situation, it wasn't monitored. They gave him the ability to pull it off. Now, it might seem far-fetched, and it certainly would seem far-fetched, unless I'm able to put some beef on the bone. And the beef is the handwriting. And that is something for the jury. And the judge took it away by saying, I find, I find. I'm a judge. I find that they're sufficiently dissimilar. This turns Ninth Circuit law on its head. You didn't have an expert that you wanted to propose, or did you just want to say, you, ladies and gentlemen of the jury, have a look? That's what I wanted to do. You didn't want to do this with an expert who said, look at this, look at that? No. Okay. And then it garbles up everything. Are we always then in a position of having to go out and hire under the CJA Act a question documents examiner to go through documents and weigh them? I think the Ninth Circuit law and the statute makes it clear to do away with all of that. Do you know what I'd like to do, if you don't mind? Yes, sir. Is to spend the rest of your time and hear from the government and then hear from you and move on. Thank you.  May it please the Court. My name is Craig Dunne. I'm with the U.S. Attorney's Office in Reno, Nevada. Your Honor, I'll go directly into the issues that were addressed in the appellant's opening argument. Well, good. Then that may direct you to one of those issues. What evidence was there other than Rivera's testimony connecting Alvarez to the transaction on September 28th? Your Honor, his own words on October 16th when he confronted the informant, who was going back to meet Mr. Blanco to set up a two-pound drug transaction. Mr. Blanco wasn't at the residence, but Mr. Alvarez was there. He was wearing the informant was wearing a body wire. He came up to talk to Mr. Alvarez. And during the conversation with Mr. Alvarez, Mr. Alvarez confronted him for working for the police. And he specifically said to him, when the informant's asking about doing some more work, which was the informant being Rivera. Yes, Your Honor. Asking, you know, to set up another deal. Mr. Alvarez says to him, we found out what you did. I did you a favor last time. Those were the defendant, Mr. Alvarez's, words. Well, how does that connect him to the transaction on September 28th? Well, they're talking about they'd previously done a drug transaction together. Now he's coming up to do a second drug transaction. And as it turns out, is that Mr. Alvarez and Mr. Blanco found out that the informant was working for the DEA. Can I ask you, on precisely this point, do we have exactly the language that he used when he said do him a favor? Like, did he say we did you a favor last time, or did he say we did you a favor? I mean, can we look at that language? Because whether it's last time or not last time may make a difference in how we go through  I understand, Your Honor. The – I would refer to the affilee supplemental excerpts of record, which would be marked as U.S. EOR 145. And that is a Spanish and English transcript of the conversation between the informant who is listed as CS, or confidential source, and Mr. Alvarez Farfan on October 16th, 2001. And that transcript is completed, and it's full from excerpt of record 138 through 154. And if you look at the preceding excerpt of the conversation, the – Mr. Alvarez is confronting the informant, telling him that the police came here. He says on page 144, you tried to get away with it. He says, it would be better if you don't come around here anymore, man. And he goes further. He says, you follow us for your own benefit. And the informant says, well, if you don't – if there's a misunderstanding or something, I won't work with you guys in the future. There was testimony at trial that the word in Spanish, which is jale, J-A-L-E, translates to work in English. And that's how many drug traffickers, when they talk about drugs, they'll be talking about some jale or work. So the – Alvarez says in response, we're not working with that at all anymore. And he says, on that day, dot, dot, dot, did the favor. He goes further in the testimony or in his audio tape transcript. He's basically getting angry at the informant, saying you tried to screw us over. You thought we – he was an idiot. Don't even show your face here. We know what you did. And at the very end of that audio tape transcript, he says, it seems that you work with the narcs, and you work with the narcs. Now, that's – the tape was played at trial. The transcript was – the jury read the transcript. I read the transcript. Well, I guess I go back to my question. What is there in that transcript that ties Alvarez to the September 28th deal? Your Honor, he's talking about – he doesn't specifically say you tried to screw us over on a prior drug deal. But listening to all the evidence that was admitted to trial – and for another instance I would give, Your Honor, is that the – the – during the drug transaction, Mr. Rivera, the informant, says he met face-to-face with Mr. Alvarez in the hotel room, and the location of the hotel room got changed at the last minute. The reason we didn't have good surveillance, audio tape, or anything like that was shortly before the drug deal was supposed to take place, Mr. Blanco calls up and says, we're not going to meet at the Holiday Inn, we're going to meet at the Economy Inn. So the agents had to scramble, go over to the Economy Inn. They couldn't get there in advance to try to surveil the room where it was going to take place. So they did the best they could. Mr. Rivera, the informant, went in with an audio tape, but the quality of that tape was very poor. That's what Judge Hagan decided after listening to expert testimony that he wasn't going to admit it to evidence. But the informant testified at trial that he did a hand-to-hand exchange of three quarters of a pound of methamphetamine from the defendant, Mr. Alvarez. He had no doubt that that was who he was dealing with. And he paid him the money, went and turned the drugs back over to the DEA. The agents testified at trial that they – they were – they were facing counter-surveillance at the scene because Mr. Blanco was driving around the hotel. Now, during the transaction inside the hotel room, the informant testified at trial that there was a phone call that was made. He said Mr. Alvarez picked up the phone, said the – said some words to the person who talked to him. He asked the informant, well, who called? And – I'm sorry. He asked Mr. Alvarez who called. Mr. Alvarez says Rene, Rene Blanco. Well, we admitted at trial a cell phone record of Rene Blanco calling the Economy Hotel on that date and the time the drug transaction took place. Now, Mr. – the informant wasn't aware of, you know – you have to believe, I guess, that he not only was able to orchestrate this whole thing to deceive DEA and change the hotel room and do all this, but then also have somebody call the hotel room to corroborate what he was saying. I mean, it seems that that telephone record was – was very telling as to putting him on the scene. But go further to the trial when we play the transcript that Your Honor is asking about, well, how does that tie Mr. Alvarez? Well, I asked him when he testified under oath, you said – you told the – you had a conversation with Mr. Rivera at the residence, and you said to him, I did you a favor before. And he admitted that he had said that. And I said, well, what did you mean by that? And Mr. Alvarez's testimony was, I did him a favor because I was getting him off the property, which didn't make any sense, what he was saying. How do you do me a favor that you're getting him off the property? And then I asked him some questions about, did you know that Mr. Rivera, the informant, was working for the police? And he says, no, I didn't know that until after the fact. But on the tape, you're saying you worked for the narcs and you're getting angry with him. Once again, Mr. Alvarez is saying, no, I didn't find that after the fact. I didn't have any problem with the police. Now, this is a case where when you listen to the audio tape and read the transcript, it's pretty clear that Mr. Alvarez is getting pissed off that here's the informant coming back in to try to do a deal because he's found out the informant works for DEA. Some more corroborating evidence is while this conversation is taking place on October 16th of 2001, Alvarez and the informant, Mr. Blanco is driving around doing counter-surveillance. He sees the DEA with binoculars set up on the residence, following on. Then the DEA has to make a determination because things didn't go as planned. They had to take down the operation and arrest the two defendants. Now, I will admit, Your Honor, that the – in a case, we always like to have the surveillance, the audio tape and everything to corroborate what the informant is saying. We didn't have that opportunity because the defense – the defendants changed location at the last sentence. And as well as DEA tried to surveil it, they still ended up getting burned because on October 16th, when they went back to do the second transaction, the – Mr. Alvarez is confronting the CI, saying you work for the police. You work for the narcs. It's pretty clear that, coupled with Mr. Blanco driving around busting the surveillance officers, that these two individuals are working together. Now, go back to the very beginning. There was statements made by the defense that the informant's dealing with Mr. Blanco to set up this drug transaction. The informant testified that back on September 21st of 2001, he was sent by the DEA to go to try to – try to set up a drug deal with Mr. Blanco. When he went to meet with Mr. Blanco, he met with Mr. Blanco and Mr. Alvarez on September 21st. They talked about buying methamphetamine, quantities, prices. Then Mr. Blanco checks out the informant's background, calls one of his sources. He calls back the informant on his cell phone, saying we checked you out and we'll do the drug deal. And there were cell phone records from Mr. Blanco's phone that were admitted to trial that confirmed that phone call was made from Mr. Blanco to the informant. Right. That would go to the conspiracy count. Yes, Your Honor. Yeah. I'm really trying to focus in on the distribution count. Yes. Well, Your Honor, the testimony of the – of the informant was that Mr. Alvarez came up face-to-face and did the drug deal with him. And it seems perhaps if we didn't have that conversation a little less than a month later with Mr. Alvarez threatening the informant, saying you work for the narcs, you might say, you know, why is he confronting or why is he accusing the informant of working for the police and talking about a favor that he did in the past if it's just take it off the property? You know, the evidence at trial, considered in the light most favorable to the government, is that these two individuals were working together. Mr. Blanco said he was going to send his man, who is known by the moniker of El Negro, Mr. Alvarez, to do the transaction. And what happens? They go to room 117 of the economy inn lodge. Mr. Alvarez is there in the room. Why didn't the police at that point go to the desk manager and track him down as a witness so that they could place whoever it was in the room? Your Honor, the government, the DEA, was concerned that the hotel itself had been compromised, that the hotel owner or manager was an associate or friendly with Mr. Blanco. They were concerned about that location as it was. So they felt if they were going to go talk to somebody at that hotel, they would get tipped off, because in a prior report. All right.  You were the trial attorney. Yes, Your Honor. When your opponent stands up and wants to put these two handwriting things in, you opposed it. Yes, Your Honor. Did you know about the statute at that time? Your Honor, my understanding, I was sort of going along with it. Are you talking about the statute that says that you don't have to have a handwriting expert? The jury can make its own conclusions as to whether or not the handwriting is similar. Well, after, when I was researching the case law and appeal, I didn't know it at the time. I thought Judge Hagen was making his own sort of gatekeeping or ruling that he didn't see there was a prima facie showing for a handwriting comparison to take place. I was particularly concerned with opposing the admission of the hotel receipt, because I believe that he was being offered for the truth of the matter asserted and that he was trying to get a business record into evidence. And I didn't think that you could establish the foundation through a DEA agent. They could have called the hotel records custodian or they could have called the owner of the hotel to get that exhibit into evidence. Moreover, I thought it was, it was just sort of throwing things in the water. What was the, but the ground that the judge ruled on was not foundation for business record, was it? No, Your Honor. That's correct. The ground relied upon was that the handwriting was not similar enough and there wasn't an expert. That's correct, Your Honor. All right. But the statute says you don't need an expert, right? So what do you say to that, to the argument? I mean, the counsel's argument is since there's only one witness that put him there and that was the government informant and we tell juries in the jury instructions you've got to take their testimony very cautiously. If counsel had had this in, he would have been able to put this on an overhead projector and say, well, it wasn't my client that rented the room. It was somebody named Rodriguez. But, Your Honor, I think you have to take a great leap where you were asking earlier to compare the hotel receipt writing with the statement of the informant. I think Judge Hagan, the district court judge, he said he asked us to look at a sidebar to look at those. And he looks at the document and he says, you know, these are totally dissimilar and I'm not going to give this to the jury. And it seemed that he was doing more of a balancing test under 403, as he said he thought that they would create an unfair prejudice to the government and cause the     statements do exist. They do exist. Please. Roberts. Yes. Which part of the own page, just look at 119, page 1, which part of that, mine is all blacked out. I can't tell who wrote what. Which part of that is written by Mr. Rivera? Your Honor, the informant would have written the, on page 119 of the record I'm referring, he would have written the Spanish section that's underlined. I believe the DEA agents wrote the location, and then those are the two DEA agents' signatures at the very bottom there. So your point is, okay, the, an alternative ground that you think the judge in fact used but didn't say the words 403 was Rule 403. Yes, Your Honor. On the ground that the jury would have wasted a lot of time because there's no way that that could be construed to be similar. Correct, Your Honor. And looking at the Woodson case that this Court decided where they said there was the panel actually talking about in the absence of extreme or unusual circumstances, not present here, we see no reason why handwriting comparisons cannot be made by the jurors and conclusions drawn for them either in the presence or the absence of the expert opinion. When you look at the Woodson case, they're talking about some invoices where there was testimony, one from a handwriting expert, even though he said he couldn't make a comparison. But you had evidence from a witness who says that the defendant actually signed those invoices. In the present case, we don't have anybody that's going to come in to say that Mr. Rivera, the informant, signed the hotel receipt. That's why we're comparing the handwriting. Yes, Your Honor. But I believe that the Court was concerned where you just, if you wanted to do that, if you wanted to have the comparison done, you didn't have even a lay opinion testimony to say that looks like Mr. Rivera's signature on the hotel receipt. All right. Counsel raised another point. He said that later on in the trial, but he wasn't sure when, he got this record from Alcatel or Altel saying that Mr. Rodriguez, that Mr. Rivera had taken out a cell phone in the name of Rodriguez. When did that come to the trial judge's attention and in what manner? Your Honor, I'd be speculating myself if I would be able to try to exactly tell you when it did. It was sometime later in the trial. I don't recall if it came in place before deliberations or after. I don't recall exactly when it was. All right. Thank you. And I would also note for the Court in the, on the excerpt of Record 118 there, it has, you can't quite make out the first name, but it almost looks like an Alvarez or Alvarez Rodriguez. So I think it cut both ways if you're claiming to claim that because the name, a common Mexican name of Rodriguez is listed, and then showing the Altel record that shows Rodriguez or Rodriguez Javier, that that's essentially what I'm saying. That would go to the weight of the evidence. But Mr. Cummings, where in the record does it show the judge in effect did a 403 analysis? For the? For the exclusion of the handwriting. Where does it show, you say you can in effect read it as a Rule 403 exclusion. Where would that be? Your Honor, I would point the Court to the excerpt of Record from the appellant on the bottom of 113 and the top of 114. The Court talks about his own examination showed that unfair prejudice to the government might arise by virtue of the fact that the handwriting is dissimilar. He goes further to say, I do not believe I'm going to call upon the jury to speculate that one person wrote both documents. All right. I see it. Thank you. And I would just briefly mention on the audio tape that was suppressed dealing with the transaction that took place in the hotel room. The defendant in his pleadings in Excerpt of Record 19 asked the Court to exclude the tape based on the inaudibility. And during the evidentiary hearing before Judge Hagan, there were three experts, the court's expert, the government's expert, and the defense expert. And the defendant's expert agreed with the court's expert that the tape was substantially unintelligible. And that's on Excerpt of Record 74. There was a Dr. Peterson who testified. So essentially, the defense is arguing keep the tape out because it's poor quality. The judge does so. And now here we are alleging that that was error to do so. The government believes that the Court did properly make factual findings after holding the evidentiary hearing. The government wanted the tape to come in. We were unsuccessful in doing so. Does the Court have any questions regarding the other issues that were raised by the defendant? I would submit on those unless there are specific questions. Thank you very much. Thank you, Your Honor. Yes, please. It was rather interesting about the tape itself because the first tape, the first translation of N-8 we had had English spoken on the tape. And so I was relying upon that to prove that Alvarez was far too backward, didn't know any English phrases. When I brought that matter up, at the start of the initial trial, I found we got a new translation on the day the initial trial, the trial was to initially commence, I think on February 26th. The new translation took out all English phrases. When I found out, and this is in the record, when I found out what occurred, what apparently occurred is the interpreter down in Los Angeles received a call from the U.S. Attorney's Office telling her or telling the interpreter service that there was no English spoken between these two individuals. Then we got a new translation with no English on the interpretation. I was unable to get the name from the interpreter that they sent, which was the new interpreter, not the old interpreter. I didn't know the name of the old interpreter that I wanted to help me bolster my case. And so that was another fly in the ointment that Judge Hagen had to deal with, and I think that kind of pushed him towards excluding the whole nightmare by just kicking the tape out. May I ask you quickly, your analysis, I guess I hadn't even considered that the district judge was using a 403 balancing and excluding the documents. What's your response to that? I don't think it's a true 403. 403 isn't if it's prejudice to the other side, and that's the reason I wanted to get it in, because it would prejudice. He said in the record it's prejudicial. He said it's prejudicial, but that isn't if it's unfairly prejudicial. It's not unfairly prejudicial to put forward your theory of the case. It might be unfairly prejudicial to, I can't think of how it would be. He didn't analyze it that way. What the judge clearly did was said, he said, my own examination prevents you from putting this in. But isn't, I mean, can't a judge do that when a judge looks at it even in a criminal case and says no reasonable jury could find any similarity between this handwriting? This is going to be a waste of time and a sideshow, and on that ground and that ground alone, we're going to not let you go down that path. I felt it was very similar. Well, I looked at it. I don't think it's similar at all. Well, you have to take discrete, you know, and handwriting is tough. You have to take discrete portions of it. You have to take the size of it. And we were prepared to do that on the overhead and let the jury look at it, the size of the writing, the fact that it was printing, the major letters, the way the curves went in the letter. Well, look at that. All those points, none of that rings true to me in looking at the actual documents. Well, doesn't that take away my right to a jury trial, to have a judge pass on the fact if there's a case that says he can't do it and a statute that says he can't do it, isn't it? No, no. That's only as to authenticity. Well, we. Statute only goes to authenticity. It said that in no way says a judge can't exercise his or her discretion under Rule 403. Well, if you look at the totality of this case, how would Alvarez, when Alvarez was arrested, he had $80 in his pocket. The money was never compared to the original money that was used in the transaction that occurred a couple of weeks before. He had no identification. He had no way. He had nothing on him when he was arrested that would allow him to rent a room anywhere. So that goes towards our position. There were a number of circumstantial things that went towards our position, including this all-tell record. It is a coincidence that he, that Mr. Rivera uses the name Rodriguez on a fake name for Rodriguez on his cell phone, and it just happens to be the same fake name used on the motel registration card. Yeah, but you can't even tell us. See, you didn't bring that card at the time that you were offering this hotel registration receipt. You didn't have that evidence to show the Rodriguez equals Rodriguez point. You were relying only on handwriting. I squeezed that out of the government probably at the very last day of trial over there kicking and screaming, Your Honor. I had trouble with Mr. Denny from probably when we were both born we had trouble, but now we had trouble in this trial. And all I wanted was an even shake. Now, it's very important in a thin case like this to get all the facts in front of the jury. And I think we had some beef, and it was prevented from getting to the jury. There's one other issue here, if I could. Oh, I'm out. But I have the Linnick issue, and I also have this idea that he is certainly a minimal participant. He's only been in the country 16 months, has no money. Well covered, I agree. Thank you, Your Honor. Thank both counsels for effective and vigorous argument in this case. The case of Arizona and the United States v. Alvarez-Farfax has been submitted.
judges: Dw Nelson, W. Fletcher, Alsup